## Elijah Alvord *versus* James Collin *et al.*

A 1 assessment by the assessors of a town, in pursuance of a legislative grant and ap‑ portionment of a State tax, would be valid, although made by the assessors with‑ out any warrant from the State treasurer.

S ) an assessment of a county tax, duly granted and apportioned among the several towns in the county, would be valid, although made by the assessors without any warrant from the county treasurer.

A town voted to raise a certain sum for the support of schools and another sum for contingent expenses ; and in assessing these sums, together with the county tax, the assessors made one list of the school tax and another of the county tax and the sum voted for contingent expenses, and on the first list the sum assessed exceeded the sum voted for schools by more than five per cent, but the excess on both lists to gether was less than five per cent on the whole sum to be raised by taxation. It was *held*, that under *St.* 1785, *c.* 50, § 11, the assessment was valid.

Where in the assessment of a tax on unimproved land of a non‑resident proprietor, the land, by mistake, was set in the list against the name of the previous owner, but was otherwise properly and sufficiently described, the tax was *held* to have been legally assessed.

Where in the advertisement of a sale of unimproved lands of non‑resident propri‑ etors, for the payment of taxes, a parcel of land, through ignorance of its having been conveyed, was set against the name of the previous owner, but the amount of the tax, the time and place of sale, the town in which the land lay, the number of the lot, and the quantity of the land, were expressed, it was *held* that the notice of sale was sufficient, under *St.* 1785, *c.* 70, § 7.

Where a person was chosen collector of taxes " by bidding off the office at ven‑ due," by which " he was to collect the taxes of the town for five per cent," the election was sustained ; but if the terms of the vendue had been, that the person who would collect the taxes for the lowest compensation, should at all events, with‑ out regard to his fitness or qualifications, be the collector, *it seems* the election would have been illegal and void.

Where a witness, upon being shown a writing certifying that a notice of a sale was posted up in his inn, testified that the signature was in his handwriting, and that he had no doubt the certificate stated the truth though he did not recollect the fact it was *held* that the posting up of the notice was duly proved.

*Writ of entry* against James Collin, John C. Hunt and Arnold Thouvenin, to recover a parcel of land in the town of Washington. Trial before *Dewey* J.

The demandant introduced a deed from Caleb Alvord, con‑ veying the land to the demandant, dated January 27, 1818, and recorded March 19, 1819 ; also an execution in favor of Caleb Alvord against Joseph Goodwin and others, upon which the land was set off as the property of Goodwin in June 1813.

The tenants introduced a deed, under which they claimed by mesne conveyances, from Martha Gold and others, trustees

of Thomas Gold, dated in 1833 ; and a deed from Absolom
Deming, as collector of taxes of the town of Washington for
the year 1819, to Thomas Gold, dated January 8, 1821
This deed was given in pursuance of a sale of the land for the
payment of taxes assessed upon it for the year 1819.

The tenants introduced the following evidence as to the no-
tice of sale.   They read the deposition of B. Russell, which
contains a copy of the notice, to prove the publication in the
State newspaper.   Oliver Pease and Jonathan Chapel testified,
that a notice signed by Deming, collector of Washington, was
posted up, the legal time, in a public house in Washington.
Hosea Merrill junior testified, upon being shown a writing
signed by him certifying to the posting up of a similar notice at
his public house in Hinsdale, that the signature was in his
handwriting and that he had no doubt the certificate stated the
truth, though he had no recollection of the fact.   Luke Bar-
ber's certificate to the posting up in Becket, was admitted to
have the same effect as if sworn to be true.   Charles Kellogg
testified, that he saw several times at the public house of John
Ross, in Dalton, a similar notice posted up ; recollected that it
contained a description of land of Jacob and Josiah Ward, but
he did not recollect that it contained a description of land of
Caleb Alvord.

The assessment of taxes for the town of Washington, for the
year 1819, was produced from the files of the town.

No valuation was produced.

No warrant to the collector was produced, though the tax
bills delivered to the collector were produced.

Philip Eames testified, that he was one of the assessors of
the town of Washington for the year 1819, and for several
years both before and since ; that he did not recollect particu-
lars respecting the valuation and warrants for the year 1819,
but that it was the uniform practice to make out a valuation and
assessment, and to return them into the town clerk's office at
some time after the assessors were through with them, and that
therefore he had no doubt this was done that year ; and that
upon the same ground of uniform practice, he had no doubt
that a warrant was issued and attached to the tax bills.   The
town clerk testified that he had made diligent search in the

chest containing the town papers, and that he could find no valuation for that year, nor any warrant.

The records of the town were produced, to prove the grant of the town, minister, and school tax, and the appointment and qualification of the assessors and collector.

The printed resolves, granting the State and county tax, were produced. No warrant for either the State or the county tax was produced, though the apportionment of the county tax was produced ; and no evidence respecting such warrants was produced, except the testimony of Eames above stated.

The demanded premises were wild land, but there had been an actual possession of it by the tenants and their grantor, since February 1833, for the purpose of cutting wood.

The several deeds, records and papers introduced by the tenants, made a part of the case reserved. Some of the facts disclosed by them, are hereafter stated in the opinion of the Court.

If the Court should be of opinion, from all the facts in the case and such presumptions as the jury would by law be entitled to make, that the demandant could sustain his action, the tenants were to be defaulted ; otherwise a nonsuit was to be entered : or, if the Court should deem it necessary, a new trial was to be ordered.

The case was submitted without argument.

*Alvord* and *Rockwell*, for the plaintiff.

*G. J. Tucker*, for the defendants.

*Sept. 20th.*    *Morton* J. delivered the opinion of the Court. The demandant, to prove his title, introduced a deed from C. Alvord, to himself, and the levy of an execution in favor of the former against Goodwin and others. These, undoubtedly, are sufficient evidence of his seisin to enable him to maintain this action. The levy, *primâ facie* at least, vested a seisin in C. Alvord, which, by his deed, passed to the demandant. But it is unnecessary to investigate his claim, for the tenants derive their title from him. They claim the demanded premises by virtue of a sale, for the payment of taxes assessed upon the same. If this sale prove to be valid, it must prevail against the demandant, because by it all his estate passed to the purchaser, from whom the tenants derive a regular title.

The lands in question were sold for the payment of the State, county, town and ministerial taxes for the year 1819. The tenants, to establish their title, must show that *all* the taxes were legally assessed, and that the land was sold for the payment thereof according to law. As their claim is under a statute conveyance, they must show a strict compliance with all the requisitions of the statute. If either of the taxes was invalid, or the proceedings of the collector illegal, the sale must be inoperative and the tenants' title fatally defective. *Stetson* v. *Kempton*, 13 Mass. R. 272 ; *Libby* v. *Burnham*, 15 Mass. R. 146 ; *Elwell* v. *Shaw*, 1 Greenl. 339. In an *ex parte* proceeding which is to divest an individual of his estate without his consent and perhaps without his knowledge, great strictness is required. No presumption is to be made in favor of such a sale when not aided by its antiquity, and the burden of proof is strictly upon those who claim under it, to make out its regularity in every respect. *Ronkendorff* v. *Taylor's Lessee*, 4 Peters's Supreme Court R. 359.

The subject naturally divides itself into three branches of inquiry : Were the assessors duly authorized to make the assessments ? Did they proceed lawfully in making them ? And was the sale made conformably to law ?

1. There seems to be no doubt of the legality of the election and qualification of the assessors.

The legislature, the only power competent to such an act, made a regular grant of a State tax for the year 1819, and duly made an apportionment of it among the several towns in the Commonwealth. Of this the evidence is unexceptionable. This authorized the assessors of Washington to assess the amount imposed upon that town. This authority did not depend upon the treasurer's warrant ; and cannot be defeated or annulled by any act or omission of any ministerial or other officer of the government. An assessment in pursuance of the grant and apportionment of a State tax would be valid, although made by the assessors, without any warrant from the treasurer. Such warrant may be competent authority for the assessors to act upon, but is not the only nor the highest evidence of the grant. The treasurer's authority to issue this precept depends upon the grant of the legislature, and the war-

Alvord<br>*v.*<br>Collin.

rant is obligatory, only so far as it is in pursuance of the legis-
lative act.

The treasurer's warrant is a mandate to the assessors, bind-
ing upon them, for the disobedience to which they are sub-
jected to the penalty prescribed by statute 1785, *c.* 50, § 4.
Although they could not be compelled to act without this man-
date, yet if they chose to act without it and did act in con-
formity with the statute, they would be justified and all others
would be bound by their proceedings. The omission there-
fore to produce the treasurer's warrant is not a fatal objection
to the assessment of the State tax.

But, were it otherwise, and did the authority of the asses-
sors depend upon proof of the treasurer's warrant, we are of
opinion, that the levy and collection of the tax and the other
circumstances proved in the case, would justify a jury in pre-
suming that a warrant was duly issued and transmitted to the
assessors. This precept is not returnable to the office whence
it issued, but remains among the archives of the town. And
we may here remark, that the testimony of the town clerk fairly
opens the door for the introduction of secondary evidence in
relation to this and all the other documents controverted in the
case.

The county tax was granted by the legislature, and duly ap-
portioned among the several towns within the county by a court
of competent jurisdiction. This, for the reasons above given,
vested adequate authority in the assessors, and the assessment
was made in pursuance of the grant and in exact conformity to
the apportionment.

Although no warrant from the county treasurer can be found,
yet the certificate of the clerk of the courts made at the time,
that such warrant did issue, and the *original* return of the
assessors that they had assessed the county tax in pursuance of
a warrant from the county treasurer, raise an irresistible pre-
sumption, that a proper warrant did issue and was duly trans-
mitted to the assessors.

It appears from the records of the town, that at a meeting
duly warned, and holden April 5, 1819, it was " *voted to raise
the sum of $300 for the benefit of schooling the present year,*"
— " *the sum of $100 for contingent expenses,*" — and " *the*

*sum of* $200 *for the benefit of the gospel.*" The two former grants were for municipal purposes, constituted a proper town charge, and should have been included in the same tax, appropriately called a *town tax.* To this, by St. 1785, *c.* 50, § 14, *might* and should have been added the county tax, making but one assessment for the whole. In making the last grant, which was for parochial purposes, the town acted as a parish.. And as some individuals might be exempted from parochial charges, who were liable to contribute towards town charges, it might be necessary to make a separate assessment of the sum granted "for the benefit of the gospel." To this latter grant there seems to be no objection. And we are of opinion, that the assessors had sufficient authority to assess all the taxes in question.

2. Did the assessors proceed according to law, in the execution of this authority ?

The original tax bills are before us ; a copy of the assessments has been produced from the town clerk's office ; and there is no reason for questioning the testimony of one of the assessors, that a valuation was duly made and filed in the proper office.

The only question in this branch of our inquiry, which has given us any trouble, relates to the amount which appears to be assessed for the support of schools.

By *St.* 1785, *c.* 50, § 11, assessors are " authorized and empowered to apportion on the polls and estates, according to law, such additional sum over and above the *precise sum to them committed to assess,* as any fractional divisions of such precise sum may render convenient in the apportionment thereof ; *not exceeding five per centum on the sum taxed.*" This 's a pretty important regulation for the government of assessors in the performance of their official duties. It has been revised and reenacted in substance, though in different language, in the Revised Statutes, *c.* 7, § 28. The practice of *overlaying* prevailed and was general, long before the above statute was enacted. It is not only convenient but indispensable, to avoid impracticable fractional divisions, and to guard against deficiencies. It was formerly deemed so essential to the due exercise of the power of assessing taxes, that it was

Alvord<br>v<br>Collin.

thought by many to be incidental to that power.   See *Colm n
v. Anderson*, 10 Mass. R. 105.   We now have no occasion
to consider this point ; because the power has been expressly
granted by the statute cited.   And we cannot say that asses-
sors may, in any degree, exceed or violate these explicit and
positive directions and limitations, without such an abuse of
authority as will avoid their acts.   These officers derive their
power wholly from statute and it is defined and regulated by
the same.   Any excess of such power is unjustifiable.   If
they may, in their discretion, assume power in a small matter,
how far may they go ?   If they may exceed these limits in a
small sum, why not in a larger one, and where shall be the
boundaries of their authority ?   Surely it cannot be made to
depend upon their own discretion.   We are aware that the
Court in *Colman* v. *Anderson*, 10 Mass. R. 105, advanced a
different doctrine.   If it be necessary to distinguish the case
at bar from that, we may refer to the statute giving and limiting
the power, as forming a manifest distinction.   At any rate we
cannot doubt, if the assessors exceed *the five per cent* to
which they are restricted by statute, the *whole tax* will be void.
If any authority be needed to support this position, *Libby* v.
*Burnham*, 15 Mass. R. 144, is directly in point.   See also
*Elwell* v. *Shaw*, 1 Greenl. 339, and *Huse* v. *Merriam*, 2
Greenl. 375.

This brings us to the inquiry whether the assessors did in
any of those taxes, assess a larger sum than they were author-
ized to assess.

The State tax may now be united in the same assessment
with the town and county tax.   Revised Stat. *c*. 7, § 25.   But
it was otherwise when the taxes in question were made.   The
State tax was accordingly assessed separately.   But there ap-
pears to be no excess in the assessment.

It is also very apparent that there was no excess in the min-
isterial tax.

The county tax then, as now, might be united with the town
tax.   *St*. 1785, *c*. 50, § 14.   It was accordingly so done.
The county tax was $106·19 ; the grant for contingent ex-
penses was $100, and for the support of schools $300 ; making
in the whole $506·19.   Five per cent upon this sum would be

$25·31. This would authorize the assessment of the gross sum of $531·50. The amount of the taxes actually assessed was $529·82, being less by $1 68 than the assessors were authorized to assess. In this view of the case, there seems to be no excess of authority on the part of the assessors.

But in looking into the papers we find that the assessors made four different lists of the taxes. One, of the State tax ; another of the ministerial tax ; another of the school tax ; and a fourth of the town and county tax. The first two were necessarily and properly made· separately. But there could have been no reason for making separate lists of the other three. The grants for the support of schools and for contingent expenses, were made at the same time, and the one was as truly a town charge as the other. It was neither convenient nor proper to separate them. It would be just as reasonable to make a separate list for every different sum granted by a town. In fact, these two sums, with the county tax, if the assessors chose to add it, constituted " *the precise sum committed to them to assess.*" And in assessing this sum the· assessors exceeded it less than five per cent. There is no complaint that it was not fairly and justly apportioned. Can it make any difference whether this was divided into several lists or all included in one ?

It appears that in one of the lists of taxes, which is called the " *school tax*," there is included $315·18. If this was intended as an assessment of the sum granted for the support of schools, it exceeds the amount by $15·18 and the addition of *five per cent* by *eighteen cents*. Had this been the whole sum then to be raised by taxation, the assessment would have been void. But if the three sums which the assessors were required to assess at the same time had (as they ought) been included in one tax, or if these several lists are to be deemed but one assessment, then the *overlay* will clearly fall within the *five per cent* upon the sum to be raised. Now the result is exactly the same, whether the whole be included in one list or divided into several separate lists. Each individual has precisely the same amount to pay, is holden to pay it at the same time and subject to the same remedies and processes. Although several formal assessments were made, yet in the bills committed to the collector, the sev-

eral sums are only separated by lines drawn between the differ-ent columns and are all added together in the last column. It cannot therefore be properly said that these were separate assess-ments. But whether they are to be deemed separate assess-ments or but one, is immaterial. A sum was committed to the assessors to assess. They were authorized " *to apportion on the polls and estate*, liable to be taxed, an additional sum, *not exceeding five per cent*." The assessors conformed to this direction. And whether they divided the precise *sum commit-ted to them* into a number of lists or assessments, or included it all in one, it was clearly within their authority, and in this respect legal and valid.

The objection to the form of the assessment cannot prevail.

The tax is set in the lists against the name of Caleb Alvord ; who, at the time, was not the owner. It is supposed by the demandant, that if this is a valid tax, it is against C. Alvord and not himself ; at any rate, that it cannot be a tax which he is liable to pay. Were this a tax on personal property or on im-proved real estate, the objection might have force. But this was " *on the unimproved land of a non-resident*." In such case the tax is upon the land itself ; constitutes a lien upon the land, and is not a personal charge against the owner. If the owner be known, he should be named ; if not, a description of the land is sufficient. Here the land was sufficiently de-scribed. The quantity of the land and the number of the division and lot, were correctly stated. And if, instead of the name of Caleb Alvord, the assessors had inserted " *the name of owners unknown*," or " *lately of C. Alvord*," the assessment would unquestionably have been good. Will a mistake of the name, when none need be given, render the tax void ? We think not. It misleads nobody. It injures nobody. It is a mistake which assessors are extremely liable to fall into, and one which cannot always be avoided. They cannot be required to keep themselves informed of all transfers of unimproved land within their respective towns. These may be made accidentally or designedly just before the taxes are levied. In this case the conveyance was recorded only a few weeks before the tax might have been made. The case of *The City of Washington* v. *Pratt*, 8 Wheat. 682, has an apparent resemblance to the

case at bar, but is clearly distinguishable from it. They depend on the construction of statutes entirely dissimilar ; the one, upon our own statute, which does not require non-resident owners of unimproved lands to be named, the other, upon a statute of the United States, expressly requiring that the land should be assessed *to the actual owner.*

We have been brought to the conclusion, that the taxes were duly authorized and legally made. It only remains to inquire whether the collector proceeded according to law, in the sale of the land.

In considering this question, we are met, *in limine,* by an objection to the appointment of the collector. And it certainly is one worthy of deliberate consideration. There is no doubt that the collector was an officer *de facto.* And the general principle is well established, that, so far as the rights of third persons, or of the public, are concerned, his acts are valid. His right to hold the office can be inquired into only in a proceeding to which he is a party. *Fowler* v. *Bebee,* 9 Mass. R. 231 ; *Nason* v. *Dillingham,* 15 Mass. R. 170 ; *Bucknam* v. *Ruggles,* 15 Mass. R. 180 ; *The People* v. *Collins,* 7 Johns. R. 549 ; *M'Instry* v. *Tanner,* 9 Johns. R. 135 ; *Jones* v. *Gibson,* 1 N. Hampsh. R. 266 ; *Moore* v. *Graves,* 3 N. Hampsh. R. 408 ; *Tucker* v. *Aiken et al.,* 7 N. Hampsh. R. 113.

But it has been supposed that a different rule applies to the sale of land, for the payment of taxes, and that to maintain a title thus acquired it was necessary to prove the legal election and qualification of all the officers employed in the assessment and collection of the tax. *Colman* v. *Anderson,* 10 Mass. R. 113 ; *Welles* v. *Battelle,* 11 Mass. R. 480 ; *Pejepscut Proprietors* v. *Ransom,* 14 Mass. R. 145 ; *Bucknam* v. *Ruggles,* 15 Mass. R. 181 ; *Hale* v. *Cushing,* 2 Greenl. 218.

It appears from the records of the town, that A. Deming was chosen constable and collector. The mode of appointing the *collector* is then explained, viz. " *by bidding off said office at vendue,*" by which " *he was to collect the taxes of said town for five per cent.*" This mode of procuring taxes to be collected, is one which has frequently been practised in different parts of the Commonwealth for a long time. To hold all elections

thus made to be illegal and the acts of officers thus chosen to be void, would be productive of extensive mischief. They should therefore be sustained, if it can be done without a violation of principle.

We fully recognise the validity of the objection to the sale of offices, whether viewed in a moral, political or legal aspect. It is inconsistent with sound policy. It tends to corruption. It diverts the attention of the electors from the personal merits of the candidates, to the price to be paid for the office. It leads to the election of incompetent and unworthy officers, and on their part, to extortion and fraudulent practices to procure a remuneration for the price paid. Bac. Abr. *Offices, F*; Com. Dig. *Officer, K; Stockwith* v. *North*, Moore, 781 ; 1 Hawk. P. C. *c*. 67, § 3; *Blachford* v. *Preston*, 8 T. R. 89.

Nor can we discover a difference, in principle, between the sale of an office for a valuable consideration, and the disposing of it to the person who will perform its duties for the lowest compensation. In our opinion, the same objection lies against both. But we doubt whether the principle applies to the appointment of collectors. In England, it seems to be confined to offices which relate to the public revenue or " concern the administration of justice." Bac. Abr. *Offices, F*; Com. Dig. *Officer, K; Godbolt's Case*, 4 Leon. 33 ; *Blachford* v. *Preston*, 8 T. R. 92 ; *Waldo* v. *Martin*, 2 Carr. & Payne, 7. A collector has a single duty to perform, viz. to collect the taxes committed to him. And although, for this purpose, he is intrusted with high powers, yet they are confined exclusively to this object. The same objection would lie to this mode of employing the overseer of the almshouse, mechanics or other laborers, or giving any contract to the lowest bidder.

The employment of a collector cannot be deemed a public office. It is a service which the town may procure to be performed in some measure as it makes other contracts. No one is bound to accept it. The compensation must be the inducement to undertake it. This the town has a right to fix. And this may be one mode, and, perhaps, not the most objectionable one, of doing it. There may be, and generally are, in every town, a number of persons equally capable of performing this service. What valid objection can exist to granting

it to the one, of these, who will perform it for the lowest compensation ? There will be very little danger that the town will select an unfit or incompetent person. The corporation, to ensure the faithful and punctual collection of the taxes, and all the members of it, to protect themselves from vexation and oppression, are alike interested to select a competent, discreet, and faithful servant. He can exercise power upon nobody but themselves.

Had the terms of the vendue been such, that the lowest bidder should, at all events, have the appointment, without regard to his fitness or qualifications, it would have been difficult to have sustained the election. But it does not appear that such was the case, and we cannot presume that it was. We must suppose that the auction proceeded on the terms, that the lowest bidder should be appointed, provided that he was a suitable person to perform the duty.

We are aware that the judiciary of a neighbouring State, the laws and institutions of which are very similar to our own, and whose decisions are entitled to high respect, has taken a different view of this subject.

In the case of the town of *Meredith* v. *Ladd*, 2 N. Hampsh. R. 517, it was holden, that the sale of a public elective office was contrary to sound policy ; "that the office of constable was a public elective office " ; and that a note given for the price of such office was void. In *Carleton* v. *Whitaker*, 5 N. Hampsh. R. 196, it was decided, that the office of deputy sheriff cannot be the subject of a sale, and that a contract for such sale is illegal. Neither of these decisions impugns the doctrine adopted by us. For although the same person was elected both constable and collector, yet it does not appear that the elections to the two offices were connected or in any degree depended upon each other. And while we intend to give no opinion upon the propriety of electing constables in this manner, we expressly found our decision on the manifest distinction between the powers and duties of the two offices.

In the case of *The Proprietors of Cardigan* v. *Page*, 6 N. Hampsh. R. 182, a question relative to a similar appointment of a collector came before that court. The late chief justice, in giving the judgment of the court, says, " that the practice

of setting up at auction the office of collector of taxes, and of choosing him who will serve most cheaply, is incorrect. A proper choice should be made by the town, and the compensation be left to be settled by the selectmen. No person can be compelled to serve as collector. But suitable persons may be found, who will be willing to serve for a reasonable compensation. What effect the circumstance, that the office was set up at auction, ought to have upon the appointment, we shall not examine." The court then decide the case upon other points, leaving the validity of the election unsettled ; and clearly implying that they did not consider that this question had before been determined by them.

But in *Tucker* v. *Aiken et al.* 7 N. Hampsh. R. 113, which occurred soon after, the court seem to assume that it had been adjudicated and was well settled, that such an election of collector was illegal. But they proceed to sustain his doings, upon the ground that he was collector *de facto*, and that third persons were justified by his acts, as such. There were circumstances on the record, strongly indicating that this was an absolute, unconditional auction, and that the town, for this cause, elected a person known not to be so well qualified as some others. It is not to be disguised, that both the late and the present chief justices, express strong opinions against the legality of the election. But it was not the point adjudged. And their decision would have been the same, had they held the election to be legal. Whatever respect, therefore, we may entertain for the opinions of these learned judges, it is manifest, that we have not to encounter any direct adjudication.

Upon the most careful examination we cannot discover that any practical evil or inconvenience has resulted from this long practised mode of appointing collectors. And we do not think that the salutary principle referred to, has such an application to it as to call upon us to interfere by pronouncing all appointments made in conformity to it, illegal and void.

The evidence of the publication of the notice of the sale, and of the posting up copies of it in Washington and three adjoining towns, with the aid to be derived from the lapse of time, is unquestionably sufficient to justify a jury in finding the facts. The only point, of any doubt, relates to the testimony

of Merrill. He does not now recollect seeing the notice. But he verifies his certificate of the fact, made near the time. This may not be in exact conformity with the rule, that a witness shall testify only from his present recollection. But how much more satisfactory and certain is such a written statement, than the memory. of any witness after such a lapse of time. It is every day's practice to prove the execution of deeds and other instruments, by subscribing witnesses, who know nothing about them except that their names were written by themselves.

The notice is objected to as being of itself insufficient. There is no doubt the notice must be good of itself. It cannot be aided by explanations given at the auction or elsewhere. The object of the notice is twofold ; to inform the owner of the proposed sale, that he may save his property by paying the taxes and the costs ; and to notify all others who may desire to purchase, that a proper competition and a fair sale may be secured. The property should be so described as to enable purchasers to identify it and to judge of its value. See 4 Peters's Sup. Court R. 362.

The seventh section of *St.* 1785, *c.* 70, regulates the sale of the unimproved lands of non-residents, for taxes. It directs the collector, when the names of the owners are known, to publish " the names of all such proprietors," " with the sum of the taxes assessed on their lands respectively, and also the time and place of sale," and when they are not known, he shall " publish the sum of the taxes on the several rights, numbers of lots or divisions," as well as the town in which the land is situated and the time and place of sale.

In this notice the sum of the taxes, the time and place of sale, the town in which the land lay, the number of the lot, and the quantity it contained, are clearly expressed ; so that there would be no danger that the owner or a stranger would mistake either. Had the land been owned by C. Alvord, in whose name it was taxed, it would manifestly have come within the first clause cited. But he having sold it to the demandant, before the taxes were assessed, the owner was unknown to the collector, and his advertisement contains every requisite contained in the latter clause.

The insertion of the name of C. Alvord would not deceive any one ; not the owner, because he would know his own land from its description, and the name of his grantor would have no tendency to mislead him, nor strangers, for they would rely on the number of the lot &c. to show its situation and value, and if they ever knew that C. Alvord owned it, his name, instead of misleading, would aid them in identifying the land. As the notice would have been good, without any name, we cannot perceive that the insertion of the name of the former owner can vitiate it.

Having examined all the objections to the tenants' title which are raised upon the report or have occurred to us, we are of opinion that they are not well founded. The demandant must therefore be nonsuited.